UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:05CR00419 SNL (AGF) |
| ANTHONY SARKIS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by Defendant,

Anthony Sarkis. Pretrial matters were referred to the undersigned United States

Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress

evidence and a motion to suppress statements. (Doc. Nos. 41 & 42). The trial is

scheduled for Monday, November 14, 2005, at 9:30 a.m.

An evidentiary hearing was held on September 7, 2005, and further testimony was

taken on September 15, 2005. The government was represented by Assistant United

States Attorney Allison H. Behrens. Defendant was present and represented by his

attorney, Stephen R. Welby. At the hearing, the government presented the testimony of

Detective Andria Van Mierlo and Officer Greg Jansen, both of whom are employed with

the St. Louis County Police Department (SLCPD). Det. Van Mierlo has been employed

with the SLCPD for approximately five years. Approximately one year ago, she became

a detective with the Bureau of Drug Enforcement and was assigned to the St. Louis

County Multi-Jurisdictional Task Force, which conducts long-term and conspiracy

investigations related to illegal drugs. Officer Jansen has been with the SLCPD for six years and is assigned as a patrol officer in the South County Precinct. The witnesses were cross-examined extensively by defense counsel. The parties were granted leave to file post-hearing memoranda, after which the matter was taken under submission. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Defendant's motions arise out of an arrest that occurred on July 20, 2005. The investigation began when Det. Van Mierlo was contacted by a confidential informant (CI) with whom she was familiar who had been used previously and was believed to be reliable. The CI advised Det. Van Mierlo that Terry Tucker, the co-defendant herein, had one kilogram of cocaine that he wanted to sell. The CI arranged for an undercover purchase of the cocaine. The meeting was to take place at the Schnucks parking lot at Butler Hill and I-55 at approximately 9:30 p.m., on July 20, 2005. Det. Van Mierlo, as the undercover purchaser, was supposed to park on the lot and raise the hood of her car.

Det. Van Mierlo and approximately seven other officers and detectives arrived at the parking lot between 8:30-9:00 p.m. Det. Van Mierlo did not park on the lot and raise her car hood, as arranged; rather, they intended to have a uniformed officer stop the car once they confirmed it was the seller's vehicle. After they arrived at the lot, Det. Van Mierlo received a call from the CI. The CI, who was a female, advised Det. Van Mierlo that Tucker had just picked her up and they were on their way to the meeting place. The

CI stated that they were in a silver and blue full-sized van, and stated that she had seen the cocaine in the van with Tucker. The officers thereafter received another telephone call from the CI confirming that they were pulling onto the lot. This information was shared with Officer Jansen. He was also advised that there were several warrants outstanding for Tucker.

Consistent with the information received, the officers observed a van matching the description provided by the CI pull onto the parking lot. The van drove around as though the driver were looking for something. The detectives had Officer Jansen stop the van a little after 9:30 p.m. Officer Jansen, who was in uniform and driving a marked police car, pulled up behind the van and activated his lights and siren. The van pulled into a parking space on the lot and stopped. There were three persons in the van. Defendant Sarkis was driving, the CI was in the front passenger seat, and co-defendant Tucker, who is paralyzed from the waist down, was riding in the back. Officer Jansen had arranged for a second uniformed officer, Officer Early, to provide backup, and he arrived in his marked vehicle soon after the stop. No effort was made by either officer to block Defendant's van, and Defendant would have been able to drive away if he had wanted to.

The detectives also observed that a second vehicle seemed to be following the van. Det. Van Mierlo and three of the other officers stopped this vehicle. The stop occurred on the other side of the parking lot, some distance from the place where Defendant's van was stopped. The driver, later identified as Terry Barber, attempted to flee. Det. Van Mierlo chased him and was able to restrain him. Because of the distance between them, it is unlikely that Defendant would have been able to observe what was occurring with

Mr. Barber. Officer Jansen had not observed the officers use any force with Mr. Barber. After they secured Mr. Barber, the detectives remained on the other side of the lot, as their plan was for the detectives to remain secreted while the uniformed officer conducted the stop.

Immediately after the van stopped, Defendant exited and walked toward the patrol car, and Officer Jansen then exited his car and walked toward Defendant. Because they did not want to risk the safety of the CI, Officer Jansen was instructed to give a traffic-related reason for the stop. Officer Jansen advised Defendant that he had been stopped because they had received a call reporting erratic driving by a vehicle matching Defendant's van. Defendant said that he had, in fact, changed lanes several times. Officer Jansen asked Defendant for identification, and he produced either a driver's license or identification card. In response to his question regarding the purpose of their trip, Defendant stated that they were coming to the Schnucks store to purchase beer. Defendant volunteered that he was a process server and gave the officer the name of an attorney or attorneys for whom he served process. Both because of the nature of the investigation and because he suspected a process server might be likely to carry a firearm, he inquired, for officer safety, whether Defendant was armed. Defendant responded that he had a handgun under the front seat. Officer Early remained with Defendant while Officer Jansen returned to his vehicle to run Defendant through the computer system. Though not requested by Officer Jansen, at some point after the stop a third uniformed officer arrived at the scene to assist if needed. At this time, Defendant was not in handcuffs, and there were two or three uniformed officers at the scene.

The computer check revealed that there was a warrant outstanding for Defendant. Officer Jansen advised Defendant of the warrant, placed him under arrest, and placed him in handcuffs. He did not advise Defendant of his <u>Miranda</u> rights, as he had no intent to interview Defendant.

The third officer stayed with Defendant outside the van while Officer Early retrieved the handgun from under the passenger seat, and Officer Jansen approached the other passengers in the van. He saw co-defendant Tucker making movements near his waistband and ordered Tucker to take his hands away from his waist. Tucker responded that he was paralyzed and had been urinating, and he showed the officer evidence of that fact. Officer Jansen thereafter had Tucker keep his hands on his head. The female (the CI) in the front seat was crying, and when he asked her why, she responded that she had outstanding warrants. Officer Jansen then took her to his vehicle and placed her under arrest.

Officer Jansen returned to the van and spoke further with co-defendant Tucker. Although it is unclear whether this information was provided before or after the female's arrest, Tucker could not state why they had come onto the parking lot and said he was just along for the ride, which Officer Jansen thought was inconsistent with the explanation he had received from Defendant. After Tucker identified himself, Officer Jansen placed him under arrest for the outstanding warrants. Inasmuch as he was paralyzed and did not appear to have a wheelchair, Tucker was not removed from the van at that time and was not placed in handcuffs.

Officer Jansen then returned to Defendant and advised him that the explanations that he and Tucker had given regarding the purpose of their trip did not match, and he stated this caused him to be suspicious. He asked Defendant if he had anything illegal in the van, and Defendant said he did not. He then asked Defendant if he could search the van, and Defendant said yes. At the time, Defendant appeared to understand what was being said. He did not appear to be suffering from any mental infirmity or to be under the influence of any drugs or alcohol, and no promises or threats were made to induce Defendant to provide consent. At this time, only the three uniformed officers were with Defendant, and none of the officers had their firearms drawn. Officer Jansen testified that even if Defendant had not provided consent, he would have searched the vehicle anyway in light of the arrest of the driver and occupants, pursuant to SLCPD standard policy. Det. Van Mierlo also testified that in light of the arrest of Defendant and the passengers, it would be their standard procedure to search the van incident to the arrest and to have the van towed. Defendant was not advised of his <u>Miranda</u> rights at this time, nor was he specifically advised that he had the right to refuse to consent.

Officer Jansen proceeded to search the van. Defendant was standing outside the van when the search was conducted, and he did not voice any objection to the search or request that the search be discontinued. Defendant's demeanor remained calm and cooperative. Officer Jansen located a bag of marijuana, that was near co-defendant Tucker's feet, and a brick of cocaine, that was shrink-wrapped, in the rear of the van. He also found a .38 caliber revolver in a McDonald's bag near the drugs. Defendant and Tucker were thereafter arrested for the narcotics.

Officer Jansen seized the drugs and the firearms and placed them on the hood of his patrol car. By this time, several of the detectives had joined them at the scene. Approximately 20-30 minutes transpired from the time of the stop until the search was completed. Officer Jansen advised Det. Van Mierlo of what had transpired, including the conversations he had with Defendant and the passengers and the results of his search of the van.

At this point, a canine officer arrived at the scene. Prior to the arranged meeting, Det. Van Mierlo had made arrangements for the canine officer to be available, and the officers called the canine officer to come to the scene as soon as the van entered the parking lot. Had Defendant not consented to a search, Det. Van Mierlo had intended to have the canine perform a sweep of the van. The canine, which had been trained to detect narcotics, alerted to the place in the backseat where the cocaine had been found.

In light of the arrest of Defendant, the two passengers, and Mr. Barber, both the van and Mr. Barber's car were towed. Had the van not already been searched prior its being towed, the officers would have conducted an inventory search pursuant to their standard office procedures. This is done to protect any valuable items that may be in the vehicle and to protect the department from any claims. During their earlier search of the van, however, nothing of value was found, other than the drugs and firearms which had been seized. At some point following his arrest, Officer Jansen performed a brief search of Defendant, but did not locate anything of any evidentiary value. Defendant Sarkis was thereafter more fully searched by other officers incident to his arrest, and they found a

white powdered substance, which they believed to be cocaine.  Defendant was then

transported to the Division of Criminal Investigations.

Det. Van Mierlo brought Defendant to an interview room.  It was a small room

with a table and chairs.  There were no other officers in the room with her, and

Defendant's handcuffs were removed once he was brought to the interview room.  After

obtaining booking information, Det. Van Mierlo advised Defendant of his rights, both

orally and in writing, using the department's Warning and Waiver Form, which she

discussed with him.  Govt. Ex. 1.  The form provides:

> Before we ask you any questions, you must understand what your rights
> are:
>
> 1.      You do not have to make any statement at this time and have a right to
> remain silent.
>
> 2.      Anything you say can and will be used against you in a court of law.
>
> 3.      You are entitled to consult with an attorney before an interview and to have
> an attorney present at the time of the interview.
>
> 4.      If you cannot afford an attorney, one will be appointed for you.
>
> I have read the above statement of my rights and I understand what my rights are.
> I am willing to make a statement and answer questions.  I do not want a lawyer at
> this time.  I understand and know what I am doing.  No promises or threats have
> been made to me and no pressure or coercion of any kind has been used against
> me.

Id.

Defendant placed his initials at the space provided next to each of the rights and

signed the form on July 21, 2005, at 1:25 a.m.  Defendant did not ask any questions

regarding his rights or the form or ask for any explanation.  Det. Van Mierlo also signed

the form, acknowledging that the rights were read and that Defendant had executed the form.  No threats or promises were made to induce Defendant to sign the waiver, and Det. Van Mierlo did not have her weapon drawn.  Defendant thereafter made a verbal statement.  Defendant did make any requests for food, or to use the restroom, or for anything else, either before or during the interview, and he never requested any attorney.

After he completed his verbal statement, Det. Van Mierlo asked Defendant if he was willing to reduce his statement to writing, and Defendant agreed.  Det. Van Mierlo presented Defendant with the department's "Voluntary Statement" form.  Govt. Ex. 2. Prior to the space provided for the written statement, the form provides:

> I, the undersigned __Anthony Sarkis__, am _43_ years of age, having been Born on _4/21_, in _1962_, and who presently resides at ___2006 Ann Ave.__, have been duly warned and advised that I do not have to make any statement at all, answer any questions, nor do anything that might tend to incriminate me.  I have been warned that any statement that I may make, can and will be used against me in a court of law.  I have also been advised of my right to the advice and presence of counsel before or during this statement, and that if I am unable to hire counsel, one will be appointed for me, without cost or charge to me.
>
> I do not want to talk with an attorney and I hereby knowingly and purposely waive these specified rights and declare that the following voluntary statement is made without threat of physical harm or coercion, and that no promises of any nature have been made by any person(s) whomsoever.

After reading the above information, Defendant made a written statement in his own handwriting.  Det. Van Mierlo did not indicate in any way what Defendant should state and told him simply to write what he had told her.  The form indicates a start time of 1:51 a.m. on July 21, 2005, and that the two-page statement was completed at 2:21 a.m.  Both pages of the form were signed by Defendant, and his signature was witnessed by Det.

Van Mierlo. The written statement was consistent with the verbal statement Defendant had made. The entire interview process with Defendant lasted approximately one hour.

## CONCLUSIONS OF LAW

### A. **Initial Stop of the Vehicle**

Police officers may briefly stop a vehicle for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). The level of proof necessary is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989). The reasonable belief requires suspicion based on "'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 499 U.S. 411, 418 (1981)).

Defendant asserts that the officers did not have the "specific and articulable facts" necessary to stop Defendant's van under Terry. The Court disagrees. The officers had information from a confidential informant who had provided information in the past and was believed to be reliable. That informant was known to the detectives, and she advised

-10-

them that the suspect, Tucker, was in the van, and that she had actually seen the cocaine. This information from the CI was corroborated by the officers' own investigation. They thereafter observed a van that matched the description provided by the CI that arrived at the appointed place and the appointed time. The driver of the van drove around the parking lot, as though looking for something, consistent with the arrangement set with Tucker that the purchaser was to park on the lot and raise the hood of her car. This provided ample reasonable suspicion for the stop. United States v. Bustos-Torres, 396 F.3d 935, 942-43 (8th Cir. 2005) (reasonable suspicion for Terry stop where officers, in area know for drug activity, saw individual entering defendant's car after same individual had been seen conducting probable drug transaction with another car a few minutes earlier); United States v. Spotts, 275 F.3d 714, 718, 720 (8th Cir. 2002) (reasonable suspicion to stop defendant and ask him to get out of truck where truck had been seen driving by residence police were searching for methamphetamine lab and the officers had intelligence reports that the defendant dealt methamphetamine); United States v. Gonzalez, 220 F.3d 922, 925 (8th Cir. 2000) (reasonable suspicion of drug transport based on accomplice's information, including particulars of vehicle and direction of travel).

Indeed, on these facts the officers had probable cause to believe that Tucker was inside the van and engaged in criminal conduct, and that Defendant was assisting him. United States v. Powell, 39 F.3d 894, 895-96 (8th Cir. 1994) (information from reliable source, corroborated by observation of unusual pedestrian activity consistent with drug sales, sufficient for probable cause to arrest); United States v. Sherrill, 27 F.3d 344, 346

(8th Cir. 1994) (same).  They also knew that Tucker had outstanding warrants for his arrest.

After the van was stopped, the officers were justified in requesting Defendant's identification, license and registration, inquiring about the purpose of his travel, and running a computer check.  Terry, 392 U.S. 22-24; United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) ("Once a lawful stop has occurred, officers are entitled to conduct an investigation 'reasonably related in scope to the circumstances which justified the interference in the first place.'") (citations omitted); United States v. Tuley, 161 F.3d 513, 515 (8th Cir. 1998) (same); United States v. Thomas , 863 F.2d 622, 628 (9th Cir. 1988).

In this instance, Officer Jansen had reasonable cause to believe that Defendant might be armed.  Defendant had volunteered that he was a process server, and the officer knew that process servers often carry firearms.  The officers also had reasonable cause to believe that Defendant was transporting co-defendant Tucker in connection with a substantial drug transaction.  Officer Jansen was therefore justified in inquiring about the presence of firearms, for officer safety.  See United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002) (constitutionally permissible for officers to inquire during traffic stop whether defendant had any weapons).  See also New York v. Quarles, 467 U.S. 649, 658-59 (1984); United States v. Williams, 181 F.3d 945, 953-54 (8th Cir. 1999) (response to sheriff's inquiry whether officers "needed to be aware of anything else" while executing search warrant admissible under public safety exception).  And when Defendant advised the officers that he had a firearm in the front seat of the van, they were authorized to

retrieve it to assure officer safety during the course of the stop.   United States v. Fisher, 364 F.3d 970, 974 (8th Cir. 2004).

### B. **Arrest of Defendant**

After they learned Defendant's identity and that there was a warrant outstanding, the officers had probable cause to arrest Defendant based upon the outstanding warrant. Even if there had not been a warrant outstanding, the officers also had probable cause to believe that Defendant was involved in a narcotics transaction.

Probable cause exists "when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001). Accord United States v. Travis, 993 F.2d 1316, 1323 (8th Cir.), cert. denied, 510 U.S. 883 (1993) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).  Officers are not required to rule out all innocent explanations, nor are they required to be able to prove a case beyond a reasonable doubt to effect a warrantless arrest.  Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("the probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances"); Illinois v. Gates, 462 U.S. 213, 235 (1983) ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision.").  As the Eighth Circuit has observed, "We assess probable cause from the viewpoint of a reasonably prudent police

officer, acting in the circumstances of the particular case.  We remain mindful that probable cause is a practical, factual, and nontechnical concept, dealing with probabilities."  United States v. Crossland, 301 F.3d 907, 911 (8th Cir. 2002).  Moreover, in "[m]aking this determination, the court may consider the collective knowledge of all others involved."  United States v. Morgan, 997 F.2d 433, 435 (8th Cir. 1993); United States v. Rich, 795 F.2d 680, 682 (8th Cir. 1986).

Here, Defendant was driving Tucker to a prearranged drug transaction, in which the presence of cocaine in the van had been confirmed by the CI, and he drove around the parking lot as though looking for the arranged buyer.  Upon stopping his car, Defendant immediately exited the car and approached the officers, and prior to his arrest, he advised them that he had a firearm in the vehicle.  While not necessary to the probable cause determination, this determination is also bolstered by the fact that prior to Defendant's arrest, the detectives were aware that the driver of the second car, which appeared to be following the van, had attempted to flee from the officers.  Under these facts, a reasonably prudent officer would be justified in believing that Defendant was involved in a drug transaction.  Pringle, 540 U.S. at 371-72; United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) (probable cause where defendant appeared to be providing surveillance for another individual officers had cause to believe was engaged in narcotics transactions); Gonzalez, 220 F.3d at 925-26.  See also United States v. Gabrio, 295 F.3d 880, 882 (8th Cir. 2002) (probable cause for search warrant based on first-hand information of reliable informant).

The officers also were authorized to arrest co-Defendant Tucker based upon his multiple outstanding warrants and based on their probable cause to believe that he was engaged in a narcotics transaction.

### C.  Search of Defendant

After placing Defendant under arrest, the officers were entitled to search Defendant incident to his arrest.  See New York v. Belton, 453 U.S. 454, 458-59 (1981); United States v. Robinson, 414 U.S. 218, 224 (1973);  United States v. Pratt, 355 F.3d 1119, 1121, 1124 (8th Cir. 2004).  As such, neither the drugs nor any other items located on Defendant's person are subject to suppression.

### D.  Search of the Van

1. Consent to Search

It is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given.  United States v. White, 81 F.3d 775, 780 (8th Cir.) cert. denied, 519 U.S. 1011 (1996); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).  A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress.  In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given.  United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Voluntariness is a fact question to be determined from the totality of the circumstances present.  Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1974).

The factors to be considered in determining whether consent is voluntary include:

(1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001). See United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381. Among the factors to be considered in examining the environment surrounding the consent, courts examine: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez, 906 F.2d at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F.2d at 381.

At the time of these events, Defendant was a 43-year-old adult. He did not appear to be under the influence of drugs or alcohol and appeared to understand what was going on. Although Defendant was not advised of his rights under Miranda, as a process server he would have some familiarity with the legal system. And while he was under arrest at the time consent was requested, there were only three officers at the scene, not all of whom were with Defendant; none of the officers had displayed their firearms; and no threats or promises were made. While Defendant emphasizes that he was never advised

of his right not to consent, consent to search need not be knowing and intelligent; it need only be voluntary. Schneckloth, 412 U.S. at 241. As such, an individual does not need to be advised of his right to refuse consent for the consent to be voluntary. Chaidez, 906 F.2d at 380. Further, Defendant was able to observe the search as it was being conducted and never voiced any objections. Under all of these facts and circumstances, the Court finds that Defendant's consent to search was in fact voluntary.

2. Other Grounds to Support Search of Van

Even if Defendant had not provided consent to search the van or such consent were deemed to be involuntary, the officers had several other grounds to search the van in this instance. First, the officers were permitted to search the vehicle incident to the arrest of the driver and passengers. Belton, 453 U.S. at 460. This is so, even though the initial encounter of Defendant occurred outside the vehicle. Thornton v. United States, 541 U.S. 615, 124 S.Ct. 2127, 2132 (2004); United States v. Poggemiller, 375 F.3d 686, 688 (8th Cir. 2004), cert. denied, 125 S.Ct. 1614 (2005).

Second, based on the information provided by the CI, who had proven reliable in the past, and their own corroboration, the officers had probable cause to believe that the car contained contraband. They were therefore justified in seizing the car and conducting a warrantless search. United States v. Ross, 456 U.S. 798, 804-09 (1982); Chambers v. Maroney, 399 U.S. 42, 44, 52 (1970).

Third, the firearms and drugs would inevitably have been discovered. Following the arrest of the driver and passengers, the van would have been towed, pursuant to standard department procedures, and the firearms and drugs would have been discovered

during the course of an inventory search. Police may take a vehicle into custody and have it towed when they have arrested the vehicle's occupants, even if the vehicle is lawfully parked and does not pose any hazard. United States v. Hood, 183 F.3d 744, 746 (8th Cir. 1999); United States v. LaFountain, 252 F. Supp. 2d 883, 887 (D.N.D. 2003). Here, it appears that the cocaine and the second firearm were located at a place where they easily would have been located in an inventory search.

Even if the drugs had not been in easy view, they would inevitably have been discovered through use of the canine. To meet the "inevitable discovery" exception, the government must show (1) the existence of "an ongoing line of investigation distinct from the impermissible or unlawful technique" and (2) a reasonable probability, as demonstrated by a preponderance of the evidence, that the evidence would have been discovered through the permissible line of investigation. United States v. Villalba-Alvarado, 345 F.3d 1007, 1019-20 (8th Cir. 2003); accord, United States v. James, 353 F.3d 606, 617 (8th Cir. 2003); United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997). Here, Det. Van Mierlo had arranged for the drug canine to come to the scene even before Officer Jansen requested consent to search, and the officers would have searched with the canine even without Defendant's consent. Inasmuch as the drug canine alerted to where the drugs had been found, there is a reasonable probability that the drugs would have been detected by the canine.

As such, even if Defendant's consent were not voluntary, the evidence seized would be admissible under the inevitable discovery doctrine. See United States v. Hammons, 152 F.3d 1025, 1030 (8th Cir. 1998) (where officer at traffic stop improperly

opened an envelope in a man's garment, as the consent to search was involuntary, inevitable discovery exception applied based upon the officer's testimony that if he had not obtained consent, he was prepared to walk back to his patrol car and radio the drug canine unit); accord, United States v. Alvarez-Gonzalez, 319 F.3d 1070, 1072 (8th Cir. 2003) (even if question regarding immigration status leading to arrest and search were improper, reasonable probability existed that defendant would have been detained, and car towed, leading to inevitable discovery of firearm during inventory search); United States v. Glenn, 152 F.3d 1047, 1050 (8th Cir. 1998) (inevitable discovery applied to firearm discovered through improper pat-down, where officer would otherwise have completed the license check and determined the defendant was driving without a license, and reasonable probability existed that officer would have arrested him for driving without a license and thereafter found the firearm in a search incident to arrest); United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994) (assuming consent search unlawful, evidence admissible because car was unregistered, and thus could not have been driven, and therefore would surely have been impounded and subjected to inventory search).

### E.  Statements Made by Defendant

Following Defendant's arrest, he made both oral and written statements to Det. Van Mierlo.  A defendant may knowingly and intelligently waive his rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant.

Colorado v. Connelly, 479 U.S. 157 (1986). The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503 (1963). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984). See Dickerson, 530 U.S. at 444.

Prior to making any oral statement, Defendant was advised of his Miranda rights both orally and in writing, and he signed a form acknowledging his rights and his waiver of those rights. As set forth above, he is an adult who did not appear to be under the influence of any drugs or alcohol, or to be impaired in any other manner. No promises or threats were made to induce Defendant's waiver or his oral statements, and Defendant acknowledged such in his written waiver. Only one officer was present with Defendant in the room, and she did not display her weapon. As such, based on the totality of the

circumstances, the Court finds Defendant knowingly and voluntarily waived his rights and made a voluntary oral statement.

He thereafter made a written statement, in his own handwriting.  The form signed by him again expressly advised him again of his rights and of the fact that he did not have to make any statement at all.  Govt. Ex. 2.  As such, Defendant's oral and written statements made following his arrest should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Motion to Suppress Statements [Doc. Nos. 41 and 42] be **denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 14th day of October, 2005.